## Ill. Cent. R. R. Co. v. Lawrence.

(Decided May 9, 1912.)

Appeal from Jefferson Circuit Court.
(Common Pleas Branch, First Division.)

Railroads—Personal Injury—Action for Damages—Sufficiency of Evidence—Verdict.—In an action for damages against a railroad company for personal injuries, evidence examined and held that a verdict of $4,000 in favor of plaintiff was not excessive.

TRABUE, DOOLAN & COX, BLEWETT LEE and C. L. SIVLEY for appellant.

POPHAM, TRUSTY & ROOSE for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Appellee, Roy M. Lawrence, brought this action against appellant, Illinois Central Railroad Co. to recover damages for personal injuries. The jury returned a verdict in his favor for $4,000. Judgment was entered accordingly, and the railroad company appeals.

The principal grounds urged for a reversal are that the verdict is flagrantly against the evidence, and that the verdict is excessive. A proper determination of these questions will necessitate a somewhat detailed statement of the facts.

Appellee, who was a fireman in appellant's employ, was, on February 16, 1909, a passenger on passenger

train No. 131, proceeding from Louisville to Central City. Appellee was bound for Central City, where he was assigned to duty on a coal run. Train No. 131 had orders to wait at Cecelia until 7:15 for a north-bound freight train. At 7:15, the passenger train left Cecelia. In the meantime, the north-bound freight had entered the yard limits of Cecelia. The trains collided, and though they must have come together with great force, only two or three of those on the train were injured at all. It is unnecessary to consider the cause of the collision, as it is not contended that appellant is not liable, but that appellee's injuries, if any, were very slight.

Appellee testifies that he had started to get a drink of water, and had one foot in the aisle. Hansborough, the conductor, was back of him. When the trains struck Hansborough shot by appellee and fell up against the back door. Appellee was thrown against the front seat, striking his stomach, and then back on the arm rest, which he straddled, and then the back of his head struck the rear seat. One of his testacles was slightly injured, and the wind was knocked out of him. He also received a blow near his rectum. He did not think it was serious at the time. After the accident, he went to the telegraph office at Cecelia to send a telegram to his wife, stating that he was not injured in the wreck, not knowing at the time that he was hurt as badly as it afterwards developed. He remained at Cecelia about three hours. When about to leave, he could not put his right leg on the steps, and got a boy to pack his suit case. At the end of three hours, train No. 131 proceeded on its way to Central City. Appellee took that train as far as Leitchfield, where he left the train, intending to take the fast train, No. 103, to Central City. After getting off at Leitchfield he went into the telegraph office. After being there a few minutes, he began to get very sick, and told the operator that he had a pain in his stomach. He then walked outside and vomited blood. He returned to the telegraph office and told the operator that he was sick. He felt very miserable, and asked for a doctor. The doctor would not come down town, so some man put him in a buggy and took him to the doctor's sanitarium, where he was put to bed. The doctor plastered his back and put something in his arm. When the doctor did that

he threw up. The doctor in charge of the sanitarium and another doctor, whom the lawyer sent for, examined him and advised him not to move for four or five days. He returned to Louisville the next day and his wife met him. When he reached his home he sent for Dr. Kremer. His condition was so bad that they had to turn him over with a sheet. He remained in bed about two weeks. Since the accident he has suffered continually with his rectum, and is unable to control his bowels. Has frequent discharges on the streets. After being treated by Dr. Kremer, he was next operated on by Dr. J. Hunter Peak, a surgeon, who took out part of his bowels which protruded from his rectum. Before the accident, he had never suffered from anything of that kind. In September, 1910, he was again operated on by Dr. Peak. He was also treated by Dr. Gatz. At the time of the accident he weighed 162 pounds, and at the time of the trial only 134. When injured he was earning from $80 to $90 a month. Since that time he had not been able to do manual labor, and was earning only $40 a month.

Dr. Hunter Peak testified to having performed an operation on appellee for piles and prolapsed rectum. The operation was a serious one. In his opinion, appellee's inability to control his bowels existed before the operation. The second operation was performed in 1910 for a fissure and a slight stricture. It was necessary to remove some scar tissue. Could not say that affected the sphincter muscle. Was of opinion that the accident might have caused appellee's condition. Could not say that the pile tumor was an old one; or that it was a recent one; no one else could say. Was of the opinion that appellee's condition was permanent.

Dr. R. E. Gatz testified that appellee first came to him on May 7, 1910. He made an examination of appellee and analyzed his urine. Found a number of bloody tube casts present, and the specific gravity was very low. This showed a condition, in his opinion, due to external violence. He made an examination of appellee's urine on January 7, 1911, which showed a specific gravity of only 1012, and the presence of red blood cells, white blood cells, bloody tube casts and a few pus corpuscles. These facts showed an abnormal condition

of the kidneys. In the latter part of May, appellee's ear drum burst, and a considerable flow of blood and corruption resulted. The condition of his ear was normal at the time witness testified. This condition of his ear could have been due to violence. He also found that appellee's spleen had been injured. Was present with Dr. Peak when the second operation was performed. Found a great contraction of the sphincter muscle of the rectum, and also a fissured condition. In answer to an hypothetical question, based upon the circumstances of the accident, and appellee's condition, etc., witness was of the opinion that the accident was sufficient to account for appellee's condition.

Some two or three other witnesses testified to the fact that appellee was in bed from ten days to two weeks, and appeared to be suffering. His mother and mother-in-law also testified that appellee suffered a great deal after the accident. Before the accident he was a strong, healthy boy, and was able to do much hard work. Since the accident, he had been unable to control his bowels.

A witness by the name of Shea testifies to having been to the Gayety theatre on one occasion when appellee was unable to control his bowels. A policeman testifies that on one occasion he was called to the place where appellee was at work, to enable appellee to retire to a closet and relieve himslf.

According to the evidence for appellant, none of the passengers on the car saw appellee describing the movements to which he claims to have been subjected. He stated to several that he had assisted the conductor to arise. After looking at the conductor's watch, he went forward to the engine to see if anyone was hurt. He remained in Cecelia for three hours without claiming to be hurt. On the contrary, he stated to the two or three witnesses that he was not hurt. After leaving Cecelia, he told the conductor and others that he had not been hurt; that the conductor was the only person on the train who was hurt. His purpose in getting off at Leitchfield was to take the fast train, No. 103, which would put him in Central City before train No. 131 could get there. He did this because he was anxious to get out on his coal run, and so stated to two or three witnesses. Appellee never made any complaint of being injured until after

he had left train No. 131, and had gone to the telegraph office, and had been there for twenty or twenty-five minutes. He then began to complain of feeling sore. He stated that he had vomited blood. The town marshal and the operator then went outside to the point where appellee claimed to have vomited blood, and examined the place, but could find no trace of vomiting at all. The marshal and the operator both called Dr. Green, and the doctor directed appellee to be brought to his sanitarium. Dr. Green, the surgeon of the railroad at Leitchfield, says that when appellee arrived he complained of his right side, of his back and of his testicles. The doctor examined him thoroughly and could not find any objective symptom in any of the parts complained of. There was no inflammation in any part of the body, and no fever. Appellee's pulse was normal, and his respiration nearly, if not quite, so. He found no bruises or discolorations. Appellee asked the doctor if liniment would do any good, and to satisfy him the Doctor gave him a liniment plaster for his back, and also a hypodermic injection of morphine. The next morning, Dr. Green made another examination, at which time appellee complained of his rectum. Upon examining appellee's rectum, he found an old protruding pile. In the meantime, appellee had vomited as a result of the injection of morphine.

Dr. J. T. Armes, who seems to have been called by some attorney at Leitchfield to see appellee, examined appellee by himself, and also in company with Dr. Green. He could find no bruise or discoloration, nor any objective symptom of the injury except the protruding pile. As it takes some time for a pile to form, they concluded that the pile was not the result of the injury. These physicians both told him that he could return to Louisville on the afternoon train. Dr. John W. Kremer, who was called by appellee on his arrival in Louisville, visited appellee on four different occasions between February 18th and February 23rd. Dr. Kremer stripped appellee and examined him carefully, and could find nothing the matter except the protruding pile. Yielding to appellee's importunities, Dr. Kremer gave him a liniment plaster for his back, and a tonic for his stomach. After leaving appellee on February 23rd, Dr. Kremer told him to come to his office thereafter, if

he wanted treatment. On February 25th, appellee visited Dr. Kremer's office. On this occasion appellee came without stick, crutch or companion. This was the last Dr. Kremer saw of appellee until August 20, 1909, when he assisted Dr. Peak in the operation for piles, which the latter performed upon appellee. Ed Lawson, an engineer of the Illinois Central Railroad Co., saw appellee on the streets February 24th. Dr. F. T. Fort, the railroad's surgeon in Louisville, called to see appellee at his home the day after appellee arrived. Dr. Fort could find no trace of any injury or trouble of any kind except the protruding pile. Dr. Fort also testifies that appellee consulted him in the fall of 1908 as to the best method of treating piles.

It is shown by Col. Al Bourlier that the Gaiety Theatre was not opened until September 1, 1909, ten days after Dr. Peak operated on appellee for piles, and that the moving pictures in the Gaiety theatre were not put on until May 1, 1910. This evidence was in rebuttal of Shea's testimony to the effect that he was present at the Gaiety theatre at a picture show when appellee was unable to control his bowels.

Dr. Abell, who was appointed by the court to examine appellee, testifies that he could find no objective symptom of injury. Upon examination, appellee appeared to be a well-nourished specimen of physical health, with normal pulse, respiration and temperature. The condition of his sphincter muscle appeared to be good. There was no sign of any sort of bruise about the abdomen, or in the region of the kidney. By palpitation, he was able to feel appellee's kidneys, and they seemed to be normal, although appellee complained of pain on pressure. Witness could find nothing in his examination to sustain appellee's complaint. It also appears that Dr. Peak stated to Dr. Abell that he had made or had had made an analysis of appellee's urine, before appellee was operated on for piles, and the analysis did not show anything the matter with appellee's kidneys. When Dr. Abell examined appellee, he examined only those parts of which appellee complained. Appellee made no complaint as to his ear. The evidence of all the physicians who testified for appellant was to the effect that a blow in the stomach or on the rectum

or on the head, sufficient to have caused the injuries which appellee claims resulted therefrom, would have necessarily been sufficiently violent to cause suffering, and to leave some mark, at the time, and any consequent result would have developed long before the injuries were ascertained. According to these conditions the inability of appellee to control his bowels may have been due to the operation performed upon him for piles. Appellee himself was recalled and required, in the presence of the jury, to give a demonstration of the manner in which he was thrown against the seats. Two seats were before the jury. It was shown, too, that the seats against which he claims to have struck were covered with plush.

Counsel for appellant argue with great force that the evidence is wholly insufficient to show that appellee was injured to the extent that he claims. In this connection, they place great stress upon the following facts. No one saw appellee thrown upon the seat. He not only went to the telegraph office for the purpose of telegraphing his wife that he was not injured, but he stated to numerous persons that such was the case. Appellee himself admits that the injury to his testicles was very slight. The doctors who examined him found no bruises on his body. Had his injuries been as great as he claims at the time of the second trial, a blow sufficient to have produced them must have been such as to make him aware of the fact, and to show some external evidence thereof. Inasmuch as it takes some time for a pile tumor to develop, a blow on his rectum could not have produced the pile. It is much more probable that his inability, if any, to control his bowels resulted from the operation for piles, rather than from any injury received at the time of the collision. The diseased condition of his kidneys was not apparent when Dr. Peak examined him, and became apparent, if at all, over a year after the collision. It is altogether improbable that the blow, if any, which he received on the back of his head affected his ear in the manner claimed.

While these arguments have great weight, yet we cannot reverse a judgment because we, sitting as a jury, might have reached a conclusion different from that reached by the jury.

It is only when there is no evidence to support the verdict, or the verdict is flagrantly against the evi-

dence, or the verdict is so excessive as to strike us at first blush as being the result of prejudice or passion, that we have the right to interfere with the verdict of a properly instructed jury. It cannot be doubted that the collision of the trains was sufficient to cause appellee to be thrown on the seats in the manner he claims. While no one else observed his movements, too much stress can not be put upon this fact, for doubtless each of those present was thinking of himself, and had no time to think about the others until the result of the collision was known. And while it is true that appellee stated to several that he had not been hurt, it is not every case of this kind that one is made aware of every injury received. He may have thought that he was only severely shaken up, and may have honestly believed that he was not injured. His belief at the time, therefore, is not conclusive of the question, for, in spite of his belief, he may have been injured. Though it be doubtful in the extreme if the blows which he received could have caused the pile, yet they may have been sufficient to accelerate the condition then existing. In view of the fact that appellee and certain members of his family testify that he had perfect control of his bowels prior to the injury, and lost control of them after the injury, and before he was operated on, and Dr. Peak himself states that such condition existed prior to the operation, it is not for us to say that his condition was due to the effect of the operation on his sphincter muscle, rather than to the injuries received at the time of the collision. While it may be true that neither the condition of his kidneys nor the condition of his ear was due in the least to any injury received at the time of the accident, yet there was evidence to this effect sufficient to account for their condition, and in the absence of evidence tending to show that they could be accounted for in any other way, we cannot say that no weight is to be given to the opinions of the physicians who testified upon this question. While it is true that there are many facts in this case tending to support appellant's contention that appellee was not injured to the extent that he claims, yet doubtless the same argument upon this question was made to the jury that is now made to this court. Under our system, the jury are the triers of the facts, and it is only in the instances mentioned above that we may substitute our judgment for theirs. If the evidence for appellee may

be believed, then the verdict for $4,000 is no more than he is entitled to, and whether or not such evidence should be believed was a question for the jury. Being unable to say that the evidence is not sufficient to support the verdict, or that the verdict is so excessive as to strike us at first blush as being the result of prejudice or passion, it follows that the judgment should be affirmed, and it is so ordered.